CONTINENTAL CASUALTY CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4553.   Decided October 1, 1927.   (260 P. 279.)

*George H. Smith, R. B. Porter,* and *Dana T. Smith,* all of Salt Lake City, for plaintiffs.

*Harvey H. Cluff,* Att. Gen., and *J. Robt. Robinson,* Asst. Atty. Gen., for defendants.

THURMAN, C. J.

Certiorari to review an award of the Industrial Commission of Utah.

Dan Vukovich, an employee of the plaintiff mining company, was injured in the course of his employment for said company on March 13, 1924. The plaintiff Continental Casualty Company carried the insurance and assumed liability for payment of compensation at the rate of $16 per week during the period of temporary disability. On June 9, 1925, Vukovich, through his attorney, made application for compensation. A hearing was had thereon, and on October 5, 1925, defendant commission made an award awarding applicant "$16 per week for a period of 20 weeks, to be paid in a lump sum, without discount." The aggrieved party was given 20 days within which to apply for a rehearing. No application was made. On September 11, 1926, applicant filed another petition for further compensation. The commission treated this petition as an application under Comp. Laws Utah, 1917, § 3144, which provides:

"The powers and jurisdiction of the commission over each case shall be continuing, and it may from time to time make such modifi-

cation or change with respect to former findings or orders with respect thereto as in its 'opinion may be justified."

Several hearings were had on the last petition, and finally an award was made thereon on January 18, 1927. The findings and conclusions of the commission, in part, are as follows:

"Findings.

"In accordance with the evidence submitted, we find the following to be facts:

"Under date of October 5, 1925, the Industrial Commission of Utah ordered the Keystone Mining Company or the Continental Casualty Company to pay to Dan Vukovich compensation at the rate of $16 per week for a period of 20 weeks. Mr. Vukovich, on March 13, 1924, sustained a fracture of the right third transverse process of the lumbar vertebrae. In order to correct this condition the applicant submitted to what is commonly known as the Hibbs operation. The object of the Hibbs operation is to solidify certain portions of the spine adjacent to the injured vertebrae. In order to do that, the spinus processes are broken down and bridged across and in addition to that the joints between the articular facets are denuded of their cartilage by means of a curretting instrument, so that the bones forming the joints will grow together, thereby obliterating the joints. In order to determine whether that process has been accomplished, in reviewing the X-ray plates, we have tried to attempt to see whether or not that process has been successful and if these joints have been obliterated.

"The evidence shows, as testified to by Dr. Holbrook, an orthopedic surgeon, that it takes a good long time to determine whether or not the proper result has been obtained by reason of the Hibbs operation. The X-ray pictures taken in August, 1926, indicate that it has not yet solidified by reason of this operation.

"The commission based its former decision on the theory that applicant's condition was fixed and that the vertebrae between the second and third process would ankylose, unite, and solidify. However, the pictures taken in August, 1926, convinced the commission that there is no hope of securing an ankylosis of the second and third joints of the back.

"We find that, when the decision was rendered on October 5, 1925, applicant's condition was not fixed, and that his condition since that time has changed, and the medical testimony presented on the petition for rehearing and to reopen applicant's case indicates very clearly that there is a changed condition. The commission had no

means of determining on October 5, 1925, whether or not the condition was fixed, and it was not until August, 1926, when X-ray pictures were taken, that we were convinced, after reviewing the evidence submitted on applicant's petition for rehearing, that there was no hope of solidifying the joints between the second and third vertebrae, and therefore the commission now finds that the applicant is entitled to additional compensation by reason of the failure of these joints to unite.

"Conclusions.

"In view of the foregoing findings, the commission concludes that the Keystone Mining Company or the Continental Casualty should pay to Dan Vukovich 50 weeks' compensation, at the rate of $16 per week, in addition to that heretofore paid; that a reasonable attorney's fee be paid to Mr. Huntsman, who appeared before the commission at all three hearings, would be the sum of $75. This fee is fixed pursuant to section 3148, subsec. E, of the state Industrial Act, and, in our judgment, represents a reasonable fee under the circumstances.

"Wherefore it is ordered that the decision rendered by the Industrial Commission of Utah on October 5, 1925, be, and the same is hereby modified to read: 'That, in addition to the compensation heretofore paid to the applicant, Dan Vukovich, the Keystone Mining Company or the Continental Casualty Company be, and they are hereby, ordered to pay to Dan Vukovich compensation in the sum of $16 per week, for a period of 50 weeks, in a lump sum without discount.'

"It is further ordered that the Keystone Mining Company or the Continental Casualty Company pay to attorney W. R. Huntsman, the sum of $75, representing attorney's fee. Said fee is fixed by the Industrial Commission of Utah pursuant to section 3148, subsec. E, of the State Industrial Act, and is to be paid direct to the said attorney and deducted from the compensation herein awarded to the applicant.

"It is further ordered that, in case any party hereto is disatisfied with the decision herein rendered and desires to appeal from the same, application for rehearing must be filed with the commission within 20 days from the date hereof.

"This commission does hereby retain jurisdiction of this claim until the same is finally and fully paid according to law."

No application was made for a rehearing before the commission by plaintiffs before the filing of their application

for writ of review. The application for the writ was filed February 16, 1927.

Defendants have filed a notice and motion to vacate, quash, set aside, and dismiss the writ. The contention of defendants is that it does not appear in the application for the writ that plaintiffs applied to the commission for a rehearing of the cause before applying to this court for the writ of review; that therefore this court is without jurisdiction.

Plaintiffs' contention is that the last hearing before the commission was merely a rehearing of the proceeding which resulted in the award of October 5, 1925, and that the commission was without jurisdiction to grant such rehearing.

If plaintiffs' contention be true that the last hearing before the commission was in fact only a rehearing, as that term is used in the Industrial Act, then we are of opinion that plaintiffs' contention is unanswerable. If the commission attempted to grant the applicant a rehearing after the time fixed in its order of October 5, 1925, had expired, such attempt, as we construe the Industrial Act, would be in excess of the commission's jurisdiction, and the proceeding would be void. But defendants deny that the proceeding was a rehearing of the former award of the commission, and insist it was a proceeding under section 3144 of the statute hereinbefore quoted.

We are convinced, from the findings of the commission above quoted and from announcements made by the chairman of the commission during the hearing that it was at least an attempt to exercise jurisdiction under ∎ section 3144, supra, which confers continuing jurisdiction upon the commission, as therein provided. Furthermore, while it appears in the findings above quoted that the commission referred to the proceeding as a *rehearing*, the whole tenor of the proceeding indicates that it was a hearing under the statute conferring continuing jurisdiction. Before the taking of testimony on the last petition, Mr. Beveridge, representative of the plaintiff Casualty Com-

pany, objected to reopening the case on the grounds that it was only a rehearing, and that, as a rehearing, it was not in time. Mr. Knerr, chairman of the commission, made the following statement:

"Let the record show that attached to the petition is a communication signed by Dr. S. C. Baldwin, wherein he gives a history of the case and his opinion as to the disability. The commission believes in this case, Mr. Beveridge, that the burden rests with the applicant to establish that there is a change in his condition since the award rendered by the commission of the 5th day of October, 1925. We feel that, in case he can establish that his condition has changed since the decision was rendered, the commission has continuing jurisdiction and may modify its former decision in accordance with the facts. We understand also that would apply also to the employer in case the commission rendered a decision awarding a certain number of weeks of permanent partial disability and during the term of payment of such compensation it should be established that his condition had changed and he was getting better and therefore had reduced the percentage of permanent partial disability. I am quite sure that the commission would be obliged to reopen this case and order an increase in the amount of compensation paid by defendant on the theory that reopening this case places the burden on the applicant himself to show that his condition has changed since the written decision was rendered."

So that, whatever may have been the evidence in the case, it is quite conclusive that the proceeding was had under the statute conferring continuing jurisdiction.

The nature of the injury and the purpose of the Hibbs operation are tersely stated in the findings. At the time of the hearings which resulted in the first award rendered October 5, 1925, the commission evidently was convinced by the testimony of the experts that the Hibbs operation, which had been performed in July, 1924, was reasonably successful, and that the joints affected would ankylose and complete union be effected within a few months thereafter. There was at such hearing testimony to the effect that it would require two years or more from the time of the operation for the joints to ankylose and become a solid bone. The commission, however, apparently assumed, in view of

the evidence, that the result contemplated by the operation might be effected within 20 weeks from the date of the award, and therefore awarded applicant $16 per week for that period of time. In August, 1926, more than two years after the operation, X-ray pictures were taken of the injury and the effects of the operation, and there was substantial evidence to the effect that complete ankylosis had not been effected, especially between the second and third vertebrae. There is also substantial evidence to the effect that, where there is not complete ankylosis of the joints within the field of the operation, there may be pain and consequent disability to perform labor, especially labor which requires stooping and lifting; that, if there is movement between the joints, pain is likely to result. Consequently the purpose of the operation is to solidify the joints and eliminate movement.

As far as concerns actual change or development in the appearance of the injury, the expert witnesses found no change for the worse. But, as before stated, there is substantial evidence that the operation did not accomplish all that was expected. The applicant testified that his condition as to pain and suffering and inability to work was worse than it was before the first award.

We are not aware of any previous decision of the court exactly in point on the question presented here. Both plaintiffs and defendants agree upon the interpretation made by this court of the meaning and effect of the provisions of section 3144 hereinbefore quoted. They each, respectively, quote approvingly the following excerpt from the decision of this court in *Salt Lake City* v. *Ind. Comm.,* 61 Utah, 514, 215 P. 1047, wherein the court, referring to section 3144, says:

"It certainly was not intended by that section that the commission might resume jurisdiction of a case that had once been regularly determined without some change or new development in the injury complained of not known to the parties when the former award was made. It may often happen that some material change in the condition of applicant's injury may occur after an award has been made,

in which justice to one or the other of the parties litigant might demand a further hearing of the cause. *It might be that what was supposed to be a serious and permanent injury for which a large compensation was awarded would prove to be only slight or temporary, in which case the compensation should be substantially modified or abrogated altogether; or it might be that the injury would afterwards prove to be more serious than was supposed when the award was made, in which case the compensation should be increased. There might be other reasons for the exercise of jurisdiction under the statute last quoted which do not at present occur to the mind of the writer,* but no reason whatever appears in the instant case."

When both sides, upon a hotly contested question, agree that a certain interpretation of a statute by this court was right, it will hardly be contended that the interpretation was radically wrong. It will be noted in the language employed the court did not attempt to definitely determine the limits of the commission's jurisdiction under the provisions of section 3144. The court did, however, attempt to interpret the statute as applied to the facts of that particular case and at the same time announce a rule that would be applied to all cases where the facts were substantially similar. The portion of the excerpt which we have italicized for convenience speaks for itself, and clearly indicates that section 3144 is susceptible of a reasonably broad interpretation, dependent upon the facts of the particular case. As stated by the late Mr. Justice Frick in *Aetna Life Insurance Co.* v. *Ind. Comm.* (Utah) 252 P. at page 569, a case in many respects analogous to the case at bar:

"While the writer is firmly of the opinion that the rule laid down in *Salt Lake City* v. *Industrial Commission, supra,* should be adhered to, yet he is also convinced that section 3144 [supra] should receive a liberal construction and application where, as in this case, the jurisdictional facts are all established."

In the instant case the point is made by plaintiffs that the evidence fails to show any change in the condition of the applicant after the award of October 5, 1925, and prior to the hearing which resulted in the last award.

The testimony of the applicant was that he was much worse, suffered more pain, and was less able to work. But, aside from his testimony on that subject, let us consider the case from another point of view. He was not able to work October 5, 1925, when the first award was made, and for that reason he was awarded 20 weeks compensation at $16 per week, evidently on the assumption that at the end of that period there would be such a change in his condition that he would be able to resume work. Now if no change resulted and his condition remained the same at the end of the 20 weeks, upon what theory can it be contended that the applicant is not entitled to further compensation? If his condition was such when the first award was made that he was unable to work, and his condition was the same when he made the last application, to what end was section 3144 enacted, if not to give relief in a case of this kind? We should bear in mind, in considering this case, that, when the first award was made, it was on the assumption that the Hibbs operation would accomplish its purpose, that the joints of the vertebrae in the field of the operation would unite, become a solid bone, and that the applicant, although hampered more or less by a stiff back would nevertheless be comparatively free from pain. The commission on the last hearing found that such was not the result and that his disability still continued. In other words, there was still a disability for which additional compensation should be allowed.

In *Spring Canyon Coal Co.* v. *Ind. Comm.*, 57 Utah, 208, 193 P. 821, the applicant lost his leg in the course of his employment and was supplied with an artificial limb. For such injury the statute (section 3138) allows a fixed sum, in the following language:

"For loss of * * * one leg at or above the knee where stump remains sufficient to permit the use of an artificial limb—150 weeks."

The applicant applied for compensation for temporary disability and also for the permanent loss of his leg. The

same was allowed by the commission. On application of the company the case was reviewed by this court. The award was annulled for the reason that the commission had no authority, in that case, to award compensation for temporary disability. The award for the loss of the limb was held valid. The decision was rendered in November, 1920. In September, 1922, the case again came before the commission under the provisions of section 3144, supra. It was found that the artificial limb did not effect the purpose intended. Applicant underwent two or three subsequent operations in order to get relief. In the meantime his disability continued. In these circumstances the commission awarded him further compensation. The company again brought the case to this court for review, 60 Utah 553, 210 P. 611. It was earnestly contended by the company that the first decision of the commission was the law of the case, and that the court was bound thereby. This contention was held untenable. The court, in the course of its opinion, at page 562, quoted the provisions of section 3144, and held that the case was a proper one for the exercise of jurisdiction by the commission as provided in that section. That case bears strong analogy to the case at bar. In that case it was supposed that an artificial limb would prove effectual. An award was made accordingly. The artificial limb failed to function, disability continued, and further compensation was allowed. In the instant case it was supposed that the Hibbs operation would effect the purposes intended. The commission found it did not effect such purpose, and that disability still continued; hence the award. In this connection we also refer to *Aetna Life Insurance Co.* v. *Ind. Comm.*, heretofore referred to in another connection. Without reviewing the case in detail, the writer is of opinion that the court went further in that case to uphold the award than is necessary to go in the instant case.

We are of opinion the commission had jurisdiction to make the award allowing additional compensation.

Counsel for each of the parties have referred us to many cases in support of their respective contentions. While some of them are more or less in point, we have not deemed it necessary to cite them here. The reporter will no doubt cite them in the caption of the published opinion.

There still remains the question presented by defendants' demurrer and motion to quash and dismiss the writ. The award was made January 18, 1927. At the same time an order was made to the effect that any party dissatisfied with the decision should, within 20 days, apply for a rehearing. The plaintiffs did not apply for a rehearing, but applied to this court for a writ of review.

Defendants contend that an application for rehearing before the commission, within the time fixed by the commission, is jurisdictional, and that without such application this court has no jurisdiction to review the proceeding. Such contention seems to be clearly within the contemplation of the statute. The statute authorizing a review (Comp. Laws Utah 1917, § 3148, as amended in Sess. Laws 1919, at page 164) reads:

"Within thirty days after the application for a rehearing is denied, or, if the application is granted, within thirty days after the rendition of the decision on the rehearing, any party affected thereby may apply to the Supreme Court of this state for a writ of certiorari or review (hereinafter referred to as a writ of review) for the purpose of having the lawfulness of the original award or the award on rehearing inquired into and determined."

If there is any authority for applying to this court for a writ of review from an award of the Industrial Commission without first applying to the commission for a rehearing, we are not cognizant of the fact. We do not understand that plaintiffs contend otherwise. Their contention, if we understand it, is that what we have here held to be a proper proceeding under the provisions of section 3144, was in fact only a rehearing on the award of October 5, 1925, and that

therefore no further rehearing was necessary to confer jurisdiction on the court.

While we do not recall any decision of the court in which this particular question has been determined, we nevertheless are of opinion that up to the present time there has been no review by this court of an award made by the commission under the provisions of section 3144, without application having first been made to the commission for a rehearing of the case. Every reason for a rehearing that exists in the case of an original award exists also in the case of an award made under section 3144. Under section 3144 there must be a changed condition or a development of some kind justifying a modification of the previous award, either in favor of or against the applicant. It is just as important that the commission should have an opportunity to review and reconsider its findings as to such new conditions, in order to confer jurisdiction on a reviewing court, as it is to review and consider its findings on the previous award in order to confer such jurisdiction. As stated by the Colorado Supreme Court, in *Passini* v. *Ind. Comm. et al.,* 64 Colo. 352, 171 P. at page 371:

"The purpose of the act is to confine the settlement of compensation cases to the commission itself. * * * It is clear that the legislative intent was that the commission should be given an opportunity to review its own findings, before permitting claimants, or other dissatisfied persons, to resort to the courts."

The legislative intent, to the same effect, is equally clear under the Utah statute. No review is provided for except where there has been an application for a rehearing before the commission.

We are of opinion that in cases of this kind, as well as in cases of an original award, application for a rehearing within the time fixed by the commission is necessary to confer jurisdiction upon the court. It appearing that no such application was made by the plaintiff in the instant case before applying for a writ of review, the court is without

jurisdiction to review the proceeding except for the purpose of determining whether the commission had jurisdiction.

The writ of review theretofore issued is therefore quashed, vacated, and set aside, and the award of the commission affirmed.

CHERRY, HANSEN, and GIDEON, JJ., concur.

STRAUP, J. (Dissenting.)

The employee, Vukovich, was injured in the course of his employment March 13, 1924. The injury consisted of a fracture of one of the lumbar vertebrae and a small spicule of bone chipped off the lower margin of it. The employee was given surgical and medical treatment. On July 24, 1924, a surgical operation known as the Hibbs operation was performed on him. The purpose of the operation was to cause ankylosis between the vertebrae upon which the operation was performed, to stabilize and hold in place the fractured vertebra, and to prevent motion in that part of the spine. As explained by the surgeons, there is motion between normal vertebrae but, in case of a fractured vertebra or of a false union of fractured or broken vertebrae, there is a false motion resulting in more or less irritation and pain, to avoid which fixation by surgical operation is made by destroying the articular facets and producing or creating fresh bone or bone matter so as to make the fracture fixed or to make the fractured and adjacent vertebrae fixed and solid by ossification, thereby avoiding motion between the vertebrae involved, and that the operation involves not only the fractured vertebra but those immediately above and below the fracture, in this instance the second, third, fourth, and fifth lumbar vertebrae and the sacrum. The purpose of the operation thus was to produce rigidity and lack of motion between such vertebrae. That the operation was desirable and advisable, and was skillfully performed and produced the usual result in such kind of case is, I think, clearly shown. The employee remained in the

hospital for a period of about eight weeks after the operation and later was discharged. The employer, or the insurance carrier, voluntarily paid the employee compensation for his injury for a period of a year or more.

On April 24, 1925, the matter came to the attention of the Industrial Commission. Upon hearings had and investigations made by it between that time and June, 1925, and on the report of its medical advisory committee, consisting of Drs. Galligan, Hammond, and Pendleton, who had examined the employee on May 29, 1925, nearly a year after the operation, the commission, on June 4, 1925, ordered and directed the employer, or its insurance carrier, to pay the employee a further and additional compensation of $16 a week for 20 weeks to be paid in a lump sum of $320, and so notified all parties concerned. The advisory committee reported to the commission that as a result of the operation it found a solidification and rigidity of the vertebrae involved. On June 9, 1925, counsel for the employee, in writing, notified the commission that the compensation ordered and directed to be paid "was unfair," and that the employee did not feel justified in accepting such compensation and asked "for a formal hearing" on the matter. Thereupon the commission set the case for hearing July 28, 1925, between which time and September 23, 1925, full hearings on the merits were had with respect to the nature, character, and extent of the injury, the employee's condition since the operation, and the extent of his disability. Indeed, that was the only contested issue. At such hearings the report of the advisory committee, without objection, was put in evidence. The commission also heard the testimony of Dr. Hosmer, who performed the operation, and of Dr. Colonge and Dr. Holbrook, who all theretofore had examined the employee. At that hearing Dr. Hosmer fully explained the character and purpose of the operation. He testified that the operation involved the second, third, fourth, and fifth lumbar vertebrae and the sacrum, and testified that on a recent examination of the employee he

discovered a substantial fixation and loss of motion between all such vertebrae. His testimony in the main was corroborated by that of Dr. Colonge and of the medical advisory committe. Dr. Colonge, and as the medical committee had theretofore reported, testified that the chief difficulty was the employee's consciousness of the localized rigidity which he did not understand was the necessary and desired result of the operation, and that he had not yet accustomed himself to the rigidity. At this hearing the employee contended, as he had in all the hearings, that he could do only light work and was unable to do heavy work, and that he still suffered pain, and made complaint of pain to the various surgeons who had examined him, but who testified that they could not discover anything which would cause him pain, except Dr. Holbrook, who was called by the employee as a witness. He, in substance, testified that upon an examination of X-ray films, and upon an examination of the applicant, he was of the opinion that there was not a complete union or solidification and that consequently there was some movement between the second and third, and the third and fourth lumbar vertebrae which would occasion more or less pain; that, the operation then having been performed only about a year, he would not expect a complete stabilized condition within such period, and that more time should elapse before attempting to fix a permanent disability; that, while the employee was able to do light work, he was not able to do heavy work, and recommended that the employee be given physio-therapy treatment and massage, and that, if properly handled and with proper treatment, the employee ought to be well in a period of about eight months more. At the request of the commission, the employee was examined in the presence of the commission and counsel for the parties by Dr. Hosmer and Dr. Holbrook, Dr. Hosmer explaining the condition of the employee as the examination proceeded and after it was concluded. The doctors still disagreed; Dr. Holbrook especially contending that the X-ray films showed that there was not a com-

plete union between the second and third and third and fourth lumbar vertebrae. All of the other doctors examining the films disagreed with him as to that, and contended, that the films showed a union and fixation between such vertebrae.

Thus the character and extent of the employee's injury and the extent of disability were fully gone into, and especially with respect to the question of whether there was a fixation and loss of motion between the vertebrae involved, concerning which the commission heard the testimony of a half dozen surgeons, five contending that there was a fixation and one that there was only a partial fixation.

At the conclusion of the hearings, and upon submission of the cause, the commission, on October 5, 1925, found that the employee sustained "a fracture of the right third transverse process of the lumbar vertebra and a small spicule of bone chipped off the left lower margin of the same third lumbar vertebra," that as a result thereof the employee suffered a loss of bodily function, and ordered and directed that the employer or insurance carrier, in addition to the money already paid the employee, pay an additional sum of $16 a week for a period of 20 weeks, to be paid in a lump sum of $320 as theretofore directed by it. Not anything is contained in the order nor otherwise indicated as to any continuing jurisdiction of the cause retained except as in all final decisions rendered by the commission the recitation in the order that, "in case any party hereto is dissatisfied with the decision herein rendered and desires to appeal from the same, application for rehearing must be filed with the commission within 20 days from the date hereof." No application was made for a rehearing by either party within such period, and after such time had expired the mining company or its carrier paid the additional compensation so ordered. There the matter rested until six months or more after the decision, when the employee, claiming he was entitled to further compensation, on April 9, 1926, by an ex parte application, applied for a further hearing,

which, ex parte, was granted and a day set for the hearing. At the hearing, the mining and insurance companies objected to any further hearing, claiming that the decision rendered on October 5, 1925, was final, that no application within 20 days for a rehearing was made, and no review sought of the decision, and objected to the case being reopened or further heard. Notwithstanding the objections the commission further heard the case. At that hearing the employee was again examined by the advisory committee, then consisting of Drs. Pendleton, Callister, and Kirby, and further evidence was heard respecting the matter. As a result of that hearing, the commission, in April, 1926, affirmed its decision of October 5, 1925. With respect thereto it found:

"The commission feels, after a careful review of the circumstances in this case, and particularly after considering the conclusions made by the medical advisory committee, that it would not be justified in requiring the insurance carrier to pay compensation in addition to that heretofore paid. It does not appear that the applicant's condition has changed since the date the commission rendered its decision ordering the insurance carrier to pay to the applicant twenty weeks' compensation in a lump sum and therefore applicant's request that he be paid compensation in addition to that heretofore paid should be disallowed."

No appeal was taken from that decision and no review sought; nor was any application for a rehearing made within twenty days thereafter. The matter again there rested until about five months after the last hearing, when the employee, in September, 1926, filed a further petition with the commission wherein he alleged that before the hearing in April, 1926, he had been examined by a Dr. Ossman, but through some misunderstanding the doctor was not present at the hearing; that the commission did not have the benefit of his judgment and examination, and that, if the doctor had attended and testified, "your petitioner would have been granted and awarded further and additional compensation, and alleges that at said time the physical

condition of your petitioner was changed, and that he was then suffering greater disability than existed at the time your petitioner was awarded the 10 per cent disability." He further alleged that since the hearing "in May, 1925," he had been unable to obtain any kind of employment on account of his physical condition, and as a result of the operation his back was rendered permanently stiff and rigid, so that he was unable to bend over or do hard manual labor; that he was recently examined by Dr. Baldwin, and was advised by him that in his opinion the employee was not able to do heavy work and that his disability amounted to from 35 to 50 per cent.; and that "your petitioner alleges that he has since the last hearing in the month of May, 1925, suffered a further and greater disability than existed at the time of the rendition of said award in the month of May, 1925, and believes and therefore alleges that he is entitled to be paid further and additional compensation," and that he was entitled "to have a further hearing," with respect to his physical condition. Not anything was alleged as to what facts or conditions would be testified to by Dr. Ossman or by Dr. Baldwin, except by the latter that the employee was not able to do heavy work, and, while the employee merely in general terms alleged that he "suffered a greater and further disability than existed in May, 1925," yet alleged no facts with respect thereto, nor in what respect or in what particular there was any changed condition. Upon the filing of such application, without service or notice to the employer or the insurance carrier, the commission, by resolution ex parte, reopened the case, and granted a further hearing and set the case for hearing on October 25, 1926. The case came on for hearing November 4, 1926. At that time the mining and insurance companies appeared and objected, as they had done at the hearing in April, 1926, to reopening the case, contending that the decision of October 5, 1925, was final, and that the commission was without jurisdiction to further hear the cause, and requested the commission, before entering upon the hear-

ing, to first determine whether or not it had jurisdiction to open the case and further hear it, to which the commission replied, "The case was reopend according to resolution [on ex parte application], and we assume jurisdiction;" and thereupon the case proceeded to a hearing, the chairman of the commission, however, stating that the burden was upon the applicant to show that there was a changed condition.

Over the objections of the mining and insurance companies, a letter given by Dr. Baldwin to the employee was read into the record. It was a letter "to whom it may concern," and recited that the employee was injured in a mine by a cap falling and striking him on the lower part of the back; that he was in the hospital 2½ months and was in a cast, and was later operated on, the doctor thought, a Hibbs operation; that since leaving the hospital the employee reported that he tried to get work, but because of his injury was not able to hold a job, and that, if he bent over for 15 minutes his back hurt and his legs trembled; that an examination showed a scar on his back, and that the lower portion of his back seemed to bend slightly; that, judging from what the employee stated as to his efforts to work and his inability to accomplish anything, he judged that the employee's disability was from 35 to 50 per cent; and that in his opinion no man who had a broken back or a diseased spine should ever do heavy work again. The doctor himself was not called, nor was his deposition taken. The commission also read into the record its former decision of October 5, 1925, and the several reports of its medical advisory committee theretofore received and considered by it. Then Dr. Holbrook, the chief witness for the employee, was again called. He, in substance, testified that there was not a complete union between the second and third lumbar vertebrae and that there was still some motion between those vertebrae which would still occasion pain. At the former hearing he had testified that there was not a complete union between the second and third and between the third and

fourth lumbar vertebrae and that there was motion between such vertebrae which would occasion pain. He further testified that:

"My argument is that he had trouble there then [at the time of the former hearing] and still has it; * * * to my mind the first pictures were actual proof that consolidation had not taken place and physical examination was convincing to me that there was motion present. To other people [Dr. Colonge, Dr. Hosmer, and the advisory committee consisting of three surgeons] who made the examination of those pictures and to some who attended the hearing they showed shadow as evidence that nature was laying down a bony union, but *I* contended at that time it had been taking place; *I* said then it had not, and *I* still say it hasn't. [Six or seven surgeons still disagreed with him as they had before.] *I* say the pictures shown to-day, which were taken August, 1926, are only further proof of *my* contentions then. * * * I realize that at the first hearing which I attended that others did not take the same view of those pictures that I did, nor of the physical condition, and so you may be justified in concluding, since the majority of those examining the patient hold a different view than I, that he [the employee] was in better shape than I thought he was and that he would go on getting better; you might very well assume such a conclusion."

He was asked by the commission, in view of all the circumstances in the case, taking into consideration that he had examined the employee prior to October 5, 1925, and prior to the X-rays taken since then and just examined by him, if in his judgment, since the decision rendered in October, 1925, the employee's "condition had changed for the better or for worse." The doctor answered:

"I would say there is no material change. I am still of the same opinion I was at that time. * * * There has been some slight improvement in regards to spinal irritability—that is, the spine is not quite as sensitive as it was at that time—there has been a little improvement in the amount of muscle tension and muscle spasm over the lumbar area. The general symptoms of the case as described and interpreted by the patient are about the same; the general physical findings are about the same."

He further was asked whether in his opinion there would result a complete union between the second and third lumbar vertebrae. He answered that he thought not.

Then Dr. Ossman was called by the employee. After testifying as to the purpose of a Hibbs operation and that he had examined the employee, he, in substance, testified that in viewing the films exhibited to him it appeared that there was a solidification or bony ankylosis between the joints of the processes between the *second and third* and also the processes lower down. Then he was asked by the commission that, inasmuch as he had examined the employee in March, 1926, whether he could say the employee's condition had changed since that examination. The doctor answered, "I cannot see any change on physical examination;" and testified that when he made the examination of the employee he also examined and went into the X-ray views of the spine. Later he was recalled to the stand and had exhibited to him the X-ray films taken in August, 1926, and was asked what was shown by them. He answered that there was a union and ankylosis between the third, fourth, and fifth lumbar vertebrae and sacrum and that—

"The joint between the second and third shows increased density, signifying an ankylosis, although it is not so distinct in this particular joint as it is in the lower ones, so, in answering the question, there is some evidence of ankylosis or fusion of those joints, but, whether or not it is complete, it will be impossible for me to say. * * * I am not saying that the fixation is not sufficient between the *second and third*. It may be all right. From my interpretation of the X-rays I cannot say from that interpretation whether it is complete or not."

Then Dr. Hosmer, Dr. Colonge, Dr. Tyree, and Dr. Heuther were called. They, on examinations made, testified that there was a substantial union and ankylosis between all of the vertebrae involved, including the processes between the second and third, and so interpreted the X-ray films. The report of the medical advisory committee and the testimony of Drs. Hosmer and Colonge at this hearing were the same as on the former hearings, and on this hearing were corroborated by Drs. Heuther, Tyree, and Ossman.

At the conclusion of the hearing, and on a submission of the case, the commission found:

"That, when the decision was rendered on October 5, 1925, applicant's condition was not fixed, and that his condition since that time has changed, and the medical testimony presented on the petition for rehearing and to reopen applicant's case indicates very clearly that there is a changed condition."

The mining and insurance companies on this review not only challenge the jurisdiction of the commission to reopen the case, but also challenge its findings as to any changed condition and as not being supported by, but as being contrary to, the evidence. I think the contention is well founded.

The finding of the commission in such respect is based on the testimony of Dr. Holbrook that in his opinion there was not a complete union or solidification between the second and third lumbar vertebrae, notwithstanding the testimony to the contrary of a half dozen or more surgeons of equal ability, and that in his opinion there would be no complete union, except as might result from another operation, which he thought was inadvisable.

Though it be assumed that it was within the province of the commission to find the fact as testified to by Dr. Holbrook as against the testimony of a half dozen or more other surgeons, that there was not a complete union and that there was still motion between the second and third lumbar vertebrae, yet, even according to his testimony, there was no changed condition. At the prior hearings he testified that there was no union between the second and third lumbar vertebrae, and at the last hearing testified there still was no union, that the condition in such respect was the same, and that there was no material change in the employee's condition, though in some particulars it had improved. The substance of Dr. Holbrook's testimony was that upon the employee's condition and disability, as made to appear at the prior hearings, the commission did not then award sufficient and adequate compensation, he contending there was a loss of ability of about 33⅓ per cent. He testified to that several times at the last hearing. Dr. Ossman testi-

fied that there was no material change in the condition of the employee from the time he first examined him in March, 1926, and that in his opinion there was a union between the vertebrae involved, though not so clearly shown between the second and third. According to the prior decision of the commission, it found that the employee, as a result of the injury, sustained a broken back, and at last hearing found he still had a broken back. It is manifest that the only issue tried at the last hearing was the same issue tried on the two prior hearings, October, 1925, and April, 1926, the nature and extent of the employee's injury and the extent of his disability, and especially whether or not, as a result of the operation, the vertebrae involved were fixed and stabilized, and this too, upon the same kind of evidence and substantially upon the testimony of the same witnesses whose testimony was the same at the last hearing as on the former hearings. No facts were stated in the petition for a rehearing, and none found by the commission, showing a changed condition. Thus on the record it is clear that what was tried at the last hearing was not some new or subsequent condition arising after and prior decision and which could not have been presented or tried on the former hearings, but was a mere retrial of what was at the prior hearings presented and tried, a retrial of the same issue, the same point, and the same condition by the same kind of evidence, and in the main merely a re-examination of the same witnesses giving the same testimony theretofore given by them at the former hearings. The reasons stated by the commission in its findings for rendering a different decision at the last hearing from that on October 5, 1925, show that what was tried at the last hearing was the same thing, the same point and the same condition tried on the former hearings. The commission in its findings says that when the former decision was rendered it was on the theory that "the vertebrae between the second and third processes would ankylose, unite, and solidify," but that it was now found that they had

not, and that there was "no hope to secure an ankylosis" between such vertebrae. Such statement itself shows a mere review by the commission of its former decision or a retrial of the same issue, and the decision thereon rendered but a correction of mere error. On the former hearings one doctor testified that the processes between the second and third lumbar vertebrae had not ankylosed, six doctors that they had, and at the last hearing one doctor, the same doctor, that there was still not a complete ankylosis between such vertebrae and six or more other doctors that there was. Such is the "condition" which the commission called a "changed condition." Substance may not be so diverted or transformed by a mere misnomer, calling black white and white black.

Whether the commission based its former decision, as it now asserts, on the theory that the vertebrae between the second and third processes had ankylosed or would ankylose and unite, must be ascertained and determined by what was then presented, tried, and determined on the former hearings. Whatever theory, if any, it then had must be disclosed by its then record, and may not now be asserted by the commission aliunde the record. To permit it to do so would be most mischievous. Looking at its record, it had the same kind of evidence and no more at the last hearing, that there was no union between the second and third processes, as it had at the prior hearings; and the decisions rendered by it on the prior hearings were just as much final hearings and final dispositions of the point or condition with respect to the vertebrae involved as is the last decision, or any final decision rendered by it on a full hearing and determination of an issue. There can be no doubt about that. No continuing jurisdiction was reserved, and not anything made to appear by the findings, decision, or by any record that the commission on the prior hearings was in doubt as to the employee's condition, or the extent of his disability, or that his ultimate condition was not then determinable, or that it in any manner retained the

case for further consideration or further hearing. The most that may be said of the aliunde asserted "theory" of the commission is that on the evidence adduced on the prior hearings it had some undisclosed "thought" or opinion either that there were complete union between all of the vertebrae involved, or, if only partial or no union between some of them, they probably would unite, but now on the testimony of Dr. Holbrook that there was no union between the second and third vertebrae, which condition he testified existed at the prior hearings, the commission, by finally accepting the opinion of Dr. Holbrook as against the opinions of six or seven other surgeons, reached the conclusion that the prior award made was inadequate and thus granted further compensation. If the compensation awarded October 5, 1925, and affirmed on the hearing in April, 1926, was adequate, then was it also adequate at the last hearing, for it is indisputably shown by the testimony of Dr. Holbrook, relied on by the commission in granting further compensation, that the condition of the employee was the same at the last hearing as it was at the prior hearings, and, if any different, had improved. Thus the real question before us is, May the commission, in the exercise of what is called its continuing jurisdiction, reopen a case, not to inquire into new or changed conditions subsequent to the former and final decision and which could not have been presented and considered on such former proceedings, but to retry the case on the same issue, the same point, the same condition theretofore tried and determined, and by the same kind of evidence, to correct mere error? It is my opinion that it may not do so.

If the award last made be affirmed as having been properly made, what is to prevent the commission thereafter, on its own motion or on an ex parte application, from again opening the case and making a further award on testimony of Dr. Wizardgavitch, fresh from clinical institutions of Czechoslovakia, that all of the opinions of all of the surgeons, including Dr. Holbrook, theretofore expressed,

were puerile, and that there was not, never had been since the operation, and that there never would be, any union whatever of any of the vertebrae involved? With equal propriety the commission could say that as the result of the prior hearings it "thought" or made awards "on the theory" that there was a union between all or some of the vertebrae, or except between the second and third, or that in time there would be a complete union between all of them, but, since hearing Dr. Wizardgavitch, not only once but twice, each time contradicted by everybody else, all such theories were exploded, and the commission persuaded that grievous error was committed which it felt ought to be rectified in due haste by awarding further compensation.

Then there is the further question: Where on a record a final decision has been rendered and no application made for a rehearing within the time prescribed by the commission and the award made fully paid, and though it be assumed that the commission had or retained a continuing jurisdiction of the cause, may either party to the record, without notice to the other, apply to the commission and ex parte be granted a further or rehearing? I think not. In such case I think it clear that the party applying for a further hearing, or the commission, is required to give the other party notice of such application before a ruling on it. When a final decision has been made and the time in which to apply for a rehearing has expired and the compensation awarded fully paid, the parties have acquired a vested right in the decision which thereafter may not be disturbed or set aside and a further hearing granted without notice and an opportunity given to be heard as to whether a further or rehearing should or should not be granted; and, when the commission in such case, without notice and without giving the opposing party an opportunity to be heard, on a mere ex parte application, grants a rehearing, I think it exceeds its jurisdiction.

A further point is made that the petitioners here, the mining and insurance companies, are not in a position to invoke

a review of the last decision of the commission because neither of them, within 20 days after such decision or otherwise, filed an application before the commission for a rehearing. The statute (Comp. Laws 1917, § 3148, as amended by Laws Utah 1921, p. 181), provides:

3148. *"Right of Appeal.* (a) Within thirty days after the application for a rehearing is denied, or, if the application is granted, within thirty days after the rendition of the decision on the rehearing, any party affected thereby including the state insurance fund, may apply to the Supreme Court of this state for a writ of certiorari or review (hereinafter referred to as a writ of review) for the purpose of having the lawfulness of the original award or the award on rehearing inquired into and determined."

The section further provides that the review shall not be extended further than to determine whether or not the commission acted without or in excess of its powers and whether or not the findings of fact support the award under review, and that the provisions of the Code of Civil Procedure of this state relating to writs of review shall so far as applicable, and not in conflict with the Industrial Act, "apply to proceedings in the courts under the provisions of this section." There is no statutory provision within what time a petition for a rehearing is required to be filed. There, however, is a statute (Comp. Laws Utah 1917, § 3069) which provides that—

"Subject to the provisions of this title [Industrial Act] the commission may adopt its own rules of procedure, and may change the same from time to time in its discretion."

In pursuance of that, the commission adopted a rule that, if either party be dissatisfied with a decision rendered or an award made by the commission and desires a review thereof, he must file a petition for a rehearing before the commission within 20 days after the rendition of the decision or award made. And, in the order at the last hearing, as well as in the decision rendered in October, 1925, the commission therein stated that—

"In case any party hereto is disatisfied with the decision herein rendered and desires to appeal therefrom, application for a rehearing must be filed with the commission within 20 days from the date hereof."

While the commission may, in harmony with the Industrial Act provide reasonable rules for its own procedure and practice, yet it is apparent that it may not prescribe a procedure for this court. Nor may it designate or provide when and under what circumstances an appeal may be taken from or a review sought of a decision made by it. As to that the statute must control, and, in the absence of statutory provisions, we, and not the commission, will determine when and under what circumstances an aggrieved part may apply for and be granted a writ of review. The statute does not say that the filing of a petition before the commission for a rehearing is a prerequisite to a review, nor, in my opinion, is the statute open to such a construction. The statute in such respect refers only to a finality of a proceeding before the commission and that a review may not be had of a decision until it has become final—may not be had while the proceeding is still pending on a rehearing and before the case is finally disposed of—analagous to the Code of Civil Procedure relating to appeals, that an appeal may not be prosecuted from a judgment until a motion for new trial has been disposed of, for until then the judgment is not final, but not that a motion for new trial is a prerequisite to an appeal. That under the Code of Civil Procedure an appeal may be prosecuted from a final judgment, regardless of whether a motion for new trial was or was not made may not be doubted; and, for the same reason, a writ of review may be sought to review a final decision of the commission, regardless of whether an application for a rehearing was or was not made. In a contested case before the commission, fully heard and considered by it, questions of jurisdiction and of the sufficiency of evidence to support an award made or refused, being inherent in every case, I

see no good reason for requiring an aggrieved party to again present what theretofore was fully presented, considered, and determined by the commission and compel it to err twice before the proceedings resulting in a final decision may be reviewed.

But further as to this: The statute provides that, "if the application for a rehearing is granted," any party affected thereby may apply to this court for a writ of review "within thirty days after the rendition of the decision on rehearing." The petition filed by the applicant, as has been seen, was "for a further hearing," claiming that Dr. Ossman was unable to be present at the prior and April hearing and give his testimony, and that, had he been present and had he testified at such hearing, the applicant "would have been granted an award for an additional compensation," and that the applicant had recently been examined by Dr. Baldwin, who gave it as his opinion that the applicant's disability amounted to from 35 to 50 per cent. The commission itself, by its findings, characterized the petition as one "for a rehearing." The case ex parte was reopened, and a further or rehearing granted, and the very issue, the very point, the very condition of whether or not there was a union between all of the vertebrae involved in the operation, was again heard, tried and determined, a rehearing in fact only of what had theretofore been tried and determined. Hence I think it clear that the decision rendered by the commission at the last hearing was in fact a "decision on rehearing" and the application for a review thereof having been applied for within 30 days from such decision was I think in time.

For the reasons stated, I am of the opinion that the commission was not authorized to reopen the case and grant a further hearing; that not anything was alleged, shown, or proved to show any new or changed condition; that the writ of review was applied for in time; and that on a review thereof the award should be annulled.